IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE          §
COMMISSION,                      §
                                 §
            Plaintiff,           §
                                 §
v.                               §        Civil Action No. 3:04CV1803-L
                                 §
GARY M. KORNMAN,                 §
                                 §
            Defendant.           §

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Gary M. Kornman's Motion to Dismiss Complaint Pursuant

to Fed. R. Civ. P. 12(b)(6) and 9(b), filed November 8, 2004 and Plaintiff Securities and Exchange

Commission's Motion to Strike, filed January 18, 2005. After careful consideration of the motions,

responses, replies and applicable authority, the court **denies** Defendant's Motion to Dismiss

Complaint and **denies as moot** Plaintiff's Motion to Strike.

## I.        Procedural and Factual Background

For purposes of Defendant's motion to dismiss, the court assumes all facts alleged in the

complaint to be true. The complaint alleges that Defendant Gary M. Kornman ("Defendant" or

"Kornman") traded in securities for personal profit using material, nonpublic information that he

learned during confidential tax-planning discussions with senior executives of publicly-traded

companies, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act") and Rule 10b-5 promulgated thereunder. Compl. at 1, ¶ 1 and at 3, ¶ 5.

Kornman is a licensed attorney who resides in Dallas, Texas. *Id.* at 4, ¶ 10. In 1994,

Kornman formed The Heritage Organization L.L.C. ("Heritage"), a company with as many as 120

Dallas-based employees or associates, offering tax and estate-planning advice primarily to wealthy individuals. *Id.* ¶ 13. Heritage's services included offering tax-shelter investments involving the use of partnerships to shelter capital-gains income. *Id.* at 5, ¶ 15. In telephone calls and in written correspondence with clients and prospective clients, Heritage touted its experienced lawyers and accountants. *Id.* ¶ 16. In 2004, Heritage filed for Chapter 11 bankruptcy protection. *Id.* at 4, ¶ 13.

In addition to Heritage, Kornman also owned Heritage Securities Corporation, a securities broker-dealer registered with the Securities and Exchange Commission, and individually held various securities licenses. *Id.* ¶ 11. Kornman also personally directed the investments of two hedge funds, Heritage Capital Partners I LP and Heritage Capital Opportunities Fund I LP, which were managed by a Kornman-controlled management company, and operated for the benefit of Kornman, several entities he controlled and a few third-party investors. *Id.* ¶ 14. Kornman discontinued and liquidated the hedge funds in 2003. *Id.*

Recognizing the need to protect confidential information received from clients and prospective clients, including detailed financial information, information about family relationships, work history information, information about political contributions, along with written and recorded summaries of telephone conversations and face-to-face meetings, Heritage had in place certain confidentiality safeguards. *Id.* at 5-6, ¶¶ 16-19. For example, at the conclusion of each meeting with clients and prospective clients, Heritage personnel were required to prepare a memorandum summarizing the meeting and which contained the following confidentiality provision:

> This document and the information contained in it are Confidential Information owned by [Heritage]. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of [Heritage] only in the normal course of their [sic] duties as an employee of [Heritage] without the express written approval of the Chief Executive of

[Heritage] is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

*Id.* at 5, ¶ 18 (hereinafter, the "Confidentiality Provision"). Employees who failed to prepare the requisite memoranda were subject to fines. *Id.* at 5-6, ¶ 19. Heritage also required its employees to sign a fifty-page employment agreement that strictly prohibited the disclosure or use of confidential information, which was defined to include information from prospective clients. *Id.* ¶ 19.

### A.    Allegations Regarding MiniMed, Inc.

At all relevant times, MiniMed Inc. ("MiniMed") was a NASDAQ-listed medical-equipment company. *Id.* at 1-2, ¶ 2. The complaint alleges that between October 2000 and June 2001, Heritage personnel had telephone conferences and met with the founder and then-chief executive officer of MiniMed (the "MiniMed executive"), who was considering retaining Heritage as a personal tax adviser in anticipation of selling his controlling interest in MiniMed. *Id.* at 1-2, ¶ 2 and at 6, ¶ 20. During this period, a Heritage employee told the MiniMed executive that all information discussed with Heritage would be kept confidential. *Id.* at 6, ¶ 21. In addition, Heritage provided the MiniMed executive with a copy of its standard engagement agreement, which contained a confidentiality clause, requiring Heritage "to keep confidential . . . all documents received from the [client][.]" *Id.* ¶¶ 20-21; Def. App. at 5.

On February 2, 2001, Medtronic, Inc. ("Medtronic")[1] proposed a one-for-one stock exchange to acquire MiniMed and another company. Compl. at 6, ¶ 23. On February 7, 2001, Kornman and

---

[1]The Complaint fails to provide the court with any background information regarding Medtronic, and only by reviewing portions of Defendant's appendix is the court able to glean the nature of Medtronic's business and its relationship to MiniMed. *See, e.g.,* Def. App. at 46-47.

**Memorandum Opinion and Order – Page 3**

a Heritage associate traveled to California to meet with the MiniMed executive. *Id.* at 7, ¶ 24. As recorded by the Heritage associate in the requisite post-meeting memorandum, the MiniMed executive told Kornman that MiniMed "had a suitor who could potentially purchase Minimed and gave it a 70% chance of going through[,]" identified the suitor as a "Fortune 100 company" and told Kornman that the acquisition would probably take place "around June 2001." *Id.*; Def. App. at 42. Recognizing the highly confidential nature of the information received from the MiniMed executive, the memorandum contained the Confidentiality Provision. Compl. at 7, ¶ 24; Def. App. at 42. This February 7, 2001 meeting at which Kornman received allegedly material, nonpublic information was the third face-to-face meeting between the MiniMed executive and Heritage representatives. Compl. at 7-8, ¶ 29. On two earlier occasions – October 25 and November 30, 2000 – the MiniMed executive had disclosed confidences to Heritage associates regarding his personal financial condition and the potential acquisition of MiniMed. *Id.* at 8, ¶ 29. Kornman did not purchase MiniMed shares, however, until he received more definitive information about the acquisition at the February 7, 2001 meeting. *Id.*

On February 9, 2001, two days after the meeting, Kornman orally directed his trading assistant to purchase 6600 shares of MiniMed for the account of Heritage Capital Partners I LP, one of Kornman's hedge funds, at the market price of $38.76 per share. *Id.* ¶ 25. On May 30, 2001, Medtronic and MiniMed publicly announced that Medtronic had agreed to purchase all outstanding shares of MiniMed at $48 per share. *Id.* ¶ 27. On August 31, 2001, Kornman's hedge fund received cash for merged shares of MiniMed. Based on the $48 per share paid by Medtronic to acquire MiniMed, Kornman's hedge fund profited by approximately $67,000 on the MiniMed trades. *Id.* ¶ 28.

### B.       Allegations Regarding Hollywood Casino Corporation

At all relevant times, Hollywood Casino Corporation ("Hollywood") was a publicly traded company that developed and owned casino entertainment facilities.  Def. App. at 37.  On November 12, 2001, Hollywood's board of directors internally expressed its intent to sell Hollywood to another gaming firm, which, if completed, would result in substantial capital gains for Hollywood executives.  Compl. at 8, ¶ 31.  On November 19, 2001, Kornman and a Heritage associate met with a former-chief executive officer, founder, board member and major shareholder of Hollywood (the "Hollywood executive") to discuss the possible retention of Heritage as a personal tax adviser.  *Id.* at 2, ¶ 3 and at 8, ¶¶ 30, 32.  As recorded by the Heritage associate in the requisite post-meeting memorandum, the Hollywood executive informed Kornman that Hollywood was "definitely" going to be sold in the "near future," probably in the "late summer of 2002."  *Id.* at 8, ¶ 32; Def. App. at 29.  The Hollywood executive also told Kornman that the purchase price "should be over $10 and possibly over $11 per share."  Compl. at 8, ¶ 33.  Recognizing the highly confidential nature of the information received from the Hollywood executive, the memorandum contained the Confidentiality Provision.  *Id.*  ¶ 34; Def. App. at 29.

Prior to the November 19, 2001 meeting, Heritage associates had prior dealings with the Hollywood executive as reflected in correspondence dated February 28, March 2 and March 14, 2001, all marked "PERSONAL & CONFIDENTIAL."  Compl. at 10, ¶ 43.  In addition, Heritage associates had face-to-face meetings with the Hollywood executive on March 23 and April 11, 2001, at which the Hollywood executive disclosed confidences about his personal financial condition and the potential acquisition of Hollywood.  *Id.*  Kornman did not purchase the Hollywood shares until obtaining more definitive information about the merger at the November 19 meeting.  *Id.*

On the eve of the meeting, Hollywood's share price closed at $9.25.  *Id.* at 8, ¶ 33.  As of this meeting, although no agreement had been signed, the Hollywood executive had already held merger discussions with Penn National Gaming, Inc. ("PNG").  *Id.* at 9, ¶ 36.  Within a week of the November 19 meeting, Kornman directed his trading assistant to begin acquiring Hollywood shares in the account of Heritage Capital Opportunities Fund I LP, one of  Kornman's hedge funds.  *Id.* at 10, ¶ 40.  Kornman instructed the assistant to purchase the shares at a price below $11 per share, which was the highest acquisition price mentioned by the Hollywood executive at the November 19 meeting.  *Id.*  Between November 26, 2001 and June 27, 2002, the hedge fund acquired 29,900 shares at prices between $7.65 and $10.70 per share, with the average price being $9.39.  *Id.* ¶ 41.  On August 7, 2002, a merger was announced in which PNG would acquire Hollywood for $12.75 per share.  *Id.*  ¶ 42.  Six days later, the hedge fund sold all of its Hollywood shares at Kornman's direction for a profit of approximately $75,500.  *Id.*

On August 18, 2004, the SEC filed this action against Kornman, alleging that he intentionally, knowingly or with severe recklessness, traded in securities for personal profit using material, nonpublic information that he learned during confidential tax-planning discussions with the MiniMed and Hollywood executives, respectively, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  In its complaint, the SEC seeks both legal and equitable relief.  As legal relief, the complaint seeks the imposition of civil penalties pursuant to section 21A(a) of the Exchange Act (15 U.S.C. § 78u-1).  As equitable relief, the complaint asks the court to enter a judgment permanently enjoining Defendant from further violations of § 10(b) of the Exchange Act and Rule 10b-5, and further ordering Defendant to disgorge any ill-gotten gains from his allegedly unlawful conduct, with prejudgment interest.  The matter is before the court on

Kornman's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). After setting forth the applicable legal standard for deciding Defendant's motion to dismiss, the court will address Defendant's grounds for dismissal in turn.

## II.     Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

### A.     Applicable Standard for Dismissal under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). Stated another way, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429,

431 (7th Cir. 1993)).  The ultimate question in a Rule 12(b)(6) motion is whether the complaint

states a valid cause of action when it is viewed in the light most favorable to the plaintiff and with

every doubt resolved in favor of the plaintiff.  *Lowrey*, 117 F.3d at 247.  A plaintiff, however, must

plead specific facts, not mere conclusory allegations, to avoid dismissal.  *Guidry v. Bank of LaPlace*,

954 F.2d 278, 281 (5th Cir. 1992).

### B.    The Law of Insider Trading

In pertinent part, § 10(b) of the Exchange Act, as amended, provides:

> It shall be unlawful for any person, directly or indirectly, by the use
> of any means or instrumentality of interstate commerce or of the
> mails, or of any facility of any national securities exchange –
>
> * * *
>
>> (b) To use or employ, in connection with the purchase
>> or sale of any security registered on a national
>> securities exchange or any security not so registered,
>> . . . any manipulative or deceptive device or
>> contrivance in contravention of such rules and
>> regulations as the [Securities and Exchange]
>> Commission may prescribe as necessary or
>> appropriate in the public interest or for the protection
>> of investors.

15 U.S.C. § 78(j)(b) (1934) (amended 2000).  Pursuant to its § 10(b) rulemaking authority, the SEC

has adopted Rule 10b-5 which, in relevant part, provides:

> It shall be unlawful for any person, directly or indirectly, by the use
> of any means or instrumentality of interstate commerce, or of the
> mails or of any facility of any national securities exchange,
>
>> (a) To employ any device, scheme, or artifice to defraud, [or]
>
> * * *
>
>> (c) To engage in any act, practice, or course of business
>> which operates or would operate as a fraud or deceit upon any

> person, in connection with the purchase or sale of any
> security.

17 CFR § 240.10b-5 (1996).

Two general theories of liability exist under § 10(b) of the Exchange Act and Rule 10b-5: the "classical theory" of insider trading and the "misappropriation theory" of insider trading.  *See United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).  Under the "classical theory" of insider trading, "§ 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."  *Id.*  As stated in *O'Hagan*, "[t]rading on such information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'"  521 U.S. at 652 (quoting *Chiarella v. United States*, 445 U.S. 222, 229 (1980)).  The classical theory applies to officers, directors, and other permanent insiders of a corporation, as well as to attorneys, accountants, consultants and others who temporarily become fiduciaries of the corporation.  *Id.* (citing *Dirks v. SEC*, 463 U.S. 646, 655 (1983)).  Moreover, under *Dirks*, third party "outsiders" may also be liable for securities fraud under the classical theory when the corporate officer does not trade himself, but instead "tips" a corporate outsider, such as a friend or a family member, with the information so that the outsider can trade.  *Dirks*, 463 U.S. at 660.  The tipper is liable for divulging the information for securities trading purposes in breach of his fiduciary duty to the source of information (namely, the corporation and its shareholders), if he benefits directly, or indirectly, from the tip.  The tippee is liable "only when the insider has breached his fiduciary duty . . . and the tippee knows or should know that there has been a breach."  *Id.*

Under the "misappropriation theory" of insider trading:

> [A] person commits fraud "in connection with" a securities
> transaction, and thereby violates § 10(b) and Rule 10b-5, when he
> misappropriates confidential information for securities trading
> purposes, in breach of a duty owed to the source of the information.
> Under this theory, a fiduciary's undisclosed, self-serving use of a
> principal's information to purchase and sell securities, in breach of
> a duty of loyalty and confidentiality, defrauds the principal of the
> exclusive use of that information.

*O'Hagan*, 521 U.S. at 652.  "In lieu of premising liability on a fiduciary relationship between

company insider and purchaser or seller of the company's stock, the misappropriation theory

premises liability on the fiduciary-turned-trader's deception of those who entrusted him with access

to confidential information."  *Id.* at 652-53.  Whereas the classical theory targets "a corporate

insider's breach of duty to shareholders with whom the insider transacts[,] [t]he misappropriation

theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of

a duty owed not to a trading party, but to the source of the information."  *Id.*

In upholding the misappropriation theory of insider trading, the *O'Hagan* court found that

the theory itself, like the classical theory of insider trading, was "well tuned to an animating purpose

of the Exchange Act: to insure honest securities markets and thereby promote investor confidence."

*Id.* at 657.  The Supreme Court detailed the reasons behind § 10(b) and Rule 10b-5:

> Although informational disparity is inevitable in the securities
> markets, investors likely would hesitate to venture their capital in a
> market where trading based on misappropriated nonpublic
> information is unchecked by law.  An investor's informational
> disadvantage vis-a-vis a misappropriator with material nonpublic
> information stems from contrivance, not luck; it is a disadvantage that
> cannot be overcome with research or skill.

*Id.* at 658-59.  As stated by the Supreme Court in *O'Hagan*, there is "no general duty between all

participants in market transactions to forgo actions based on material nonpublic information"; rather,

the "misappropriation theory bars only trading on the basis of information that the wrongdoer

converted to his own use in violation of some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information." *Id.* at 663 (internal citations and punctuation omitted).

Although the Complaint does not state whether the SEC is suing Kornman under the classical or misappropriation theory, in its Response to Defendant's motion, the SEC makes clear that it relying on the misappropriation theory of liability. *See* Pl. Resp. at 1. Accordingly, the court proceeds with an analysis of such theory.

**C.      Analysis**

Defendant contends that the court should dismiss the SEC's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for the following reasons: (1) the complaint "fails to allege the required fiduciary or fiduciary-like duty between Kornman and the two executives necessary to establish liability for misappropriation under securities law" (*see* Def. Mot. at 1), and (2) "no court has ever applied the misappropriation theory of insider trading to a prospective business relationship."[2] *Id.* at 2. The

---

[2]In support of its argument that "[t]his is the wrong case" in which to apply the misappropriation theory (*see* Def. Mot. at 2), Defendant posits that the case has "weak facts" (*id.* at 22), and "even should the SEC complaint survive a motion to dismiss, the SEC will have no end of trouble proving the materiality of the information supposedly imparted to Kornman[]" as "[t]he information allegedly imparted during these routine sales calls was not material or non-public." *Id.* at 2. This may or may not be so; however, an analysis of whether the facts are strong or weak is not properly before the court in considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Therefore, the court will confine its analysis to the arguments presented in support of Defendant's motion to dismiss, and will not consider whether the underlying facts are weak or strong. Moreover, to the extent Defendant's Reply brief can be read to suggest that dismissal may be appropriate on grounds of lack of materiality (*see* Reply at 9-10), the court generally will not consider arguments raised for the first time in a reply brief. *See Lacher v. West*, 147 F.Supp.2d 538, 539 (N.D. Tex. 2001). In any event, the question of materiality cannot be resolved on a motion to dismiss unless the facts are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Given the SEC's allegations in this case, specifically regarding the timing of Kornman's acquisitions of MiniMed and Hollywood shares very shortly after his meetings with the executives and his subsequent sale of the shares for personal profit following the acquisitions (*see* Compl. at 8, ¶¶ 25, 28 and at 10, ¶¶ 40-42), the court could not conclude on a motion to dismiss that, at the time Kornman allegedly possessed the information and traded on it, such acquisition plans were "so obviously unimportant" that reasonable investors would not have considered them important in the context of the "total mix" of information available. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 228 (1988) (rejecting a "bright-line" test of materiality and adopting a "fact-specific inquiry" as "materiality depends on the significance the reasonable investor would place" on the information.).

Defendant also moves to dismiss on the basis that the complaint fails to adequately allege scienter. *Id.* The court will address Defendant's scienter argument in the context of Defendant's motion to dismiss under Fed. R. Civ. P. 9(b), as the analysis overlaps significantly.

### 1. "Fiduciary Relationship" or "Similar Relationship of Trust and Confidence"

Defendant contends as its first argument that the court should grant his motion to dismiss since the SEC has failed to allege that Kornman owed a fiduciary or fiduciary-like duty to the MiniMed and Hollywood executives. *See* Def. Mot. at 10-19; Def. Reply at 2. In support, Defendant posits as his second argument that no duty exists because "[n]o court has ever held that a mere prospective relationship may give rise to the kind of fiduciary-like duty necessary to impose insider trading liability." *See* Def. Reply at 2. Defendant further argues that even if the two executives had an expectation of confidentiality, a duty to maintain confidentiality cannot be unilaterally imposed. Def. Brief at 17. In response, the SEC contends that its complaint contains sufficient allegations which, if true, establish that Kornman violated § 10(b) of the Exchange Act and Rule 10b-5 under the misappropriation theory when he allegedly traded in securities for personal profit using material, nonpublic information that he learned during confidential tax-planning discussions with senior executives of publicly-traded companies. In support, the SEC contends that a fiduciary-like duty arose in this case because of the very nature of the services offered by Heritage (estate and tax-planning along with related legal and financial services), which "inherently involve duties of trust and confidence," given the personal, confidential and sensitive nature of the information that needs to be shared in order to obtain such services as those offered by Kornman. *See* Plf. Resp. at 10, 14. The SEC also contends that this case is not an example of an attempt to unilaterally impose a duty of confidentiality on Kornman, but that both the executives and Kornman

had an understanding that the information imparted was confidential and that Kornman and Heritage employees would safeguard the information. *Id.* at 13-16.[3]   As set forth directly below, after carefully reviewing the SEC's allegations in light of established judicial precedent, the court concludes that the SEC has sufficiently alleged that Kornman owed a duty of trust and confidence to the MiniMed and Hollywood executives sufficient to withstand Defendant's motion to dismiss for failure to state a claim for insider trading under § 10(b) of the Exchange Act and Rule 10b-5. While the court acknowledges that this is an extremely close case, it is mindful that confronted with a motion to dismiss for failure to state a claim, the question before the court is ***solely*** whether the allegations in the complaint, assuming they are true, are sufficient to state a claim, and not whether plaintiff has, in fact, established the truth of the allegations or alleged all facts that may be related to its claims. *See generally In re Netsolve, Inc. Securities Litigation*, 185 F.Supp.2d 684, 696 n.10 (W.D. Tex 2001), *quoted with approval in ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002) ("[T]o the extent the defendants argue that plaintiffs must establish facts to survive a motion to dismiss, this argument is more appropriate at the summary judgment stage.  At the motion to dismiss stage, the plaintiffs need only *allege* facts sufficient to describe the purported fraud with the requisite particularity . . . In addition, the plaintiffs need not allege all facts related to their claim . . . Such a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants know all the facts related to the alleged fraud.") (original emphasis).

---

[3]The SEC also contends that "Kornman's duty of trust and confidence derives from the attorney-client relationship." *See* Plf. Resp. at 10.  Defendant argues that the complaint does not allege that Kornman was acting as an attorney or that he rendered any legal services to either of the two executives or that the two executives were seeking legal services from Kornman. *See* Def. Reply at 2.  The court agrees with Defendant.  The SEC's reliance on the attorney-client privilege as a source of fiduciary duty herein is unsupported by the allegations in the complaint.

**Memorandum Opinion and Order – Page 13**

Before turning to the SEC's allegations of insider trading by Kornman, the court must consider the indicia giving rise to a fiduciary or fiduciary-like relationship in the arena of securities fraud. The Second Circuit Court of Appeals, along with several other appellate courts, recognized the misappropriation theory of insider trading well-before the Supreme Court's decision in *O'Hagan*. *See United States v. Chestman*, 947 F.2d 551, 566 (2nd Cir. 1991) (en banc), *cert. denied*, 503 U.S. 1004 (1992), *superseded by regulation on other grounds as stated in United States v. Kim*, 184 F.Supp.2d 1006, 1014 (N.D. Cal. 2002). In particular, the Second Circuit in *Chestman* articulated the precise contours of a fiduciary-like relationship necessary to establish a claim of insider trading under the misappropriation theory when it posed the following key question: "what constitutes a fiduciary or similar relationship of trust and confidence in the context of Rule 10b-5 criminal liability?" 947 F.2d at 567. *See also Kim*, 184 F.Supp.2d at 1010 (relying on *Chestman* as the "key case for examining the precise contours of misappropriation liability – *i.e.*, what relationships give rise to liability?").[4] After setting forth examples of common law relationships that it characterized as "inherently fiduciary," such as that between an attorney and client and an agent and principal, the court held that liability under the misappropriation theory also lies where there exists a "similar relationship of trust and confidence," which the court defined as the "functional

---

[4]Although the majority in *Chestman* stated that it was determining what constituted a fiduciary relationship in the context of a criminal case, and that "equity has occasionally established a less rigorous threshold for a fiduciary-like relationship in order to right civil wrongs" (947 F.2d at 569-70), the court need not determine whether the definition of a duty of loyalty and confidentiality should be expanded in a civil context, since the court determines that the SEC's complaint sufficiently alleges a fiduciary-like duty under the factors set forth in *Chestman*. Thus the court deliberately does not address the parties' contentions regarding this point. The court does take note that some courts employ *Chestman* to determine the existence of the duty of loyalty and confidentiality in a civil context. *See, e.g., United States v. Falbo*, 14 F.Supp.2d 508, 523 (S.D.N.Y. 1998). *Contrast SEC v. Yun*, 327 F.3d 1263, 1272 n.22 (11th Cir. 2003) (rejecting *Chestman*'s "narrow approach" in civil context, but still defining "duty of trust and confidence" as synonymous with the term "fiduciary duty.").

**Memorandum Opinion and Order – Page 14**

equivalent of a fiduciary relationship." *Id.* at 568.   For guidance, the *Chestman* court looked first to the dictionary definition of fiduciary:

> One acts in a "fiduciary capacity" when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."

*Id.* at 568-69 (quoting Black's Law Dictionary 564 (5th ed. 1979)).   Further refining its analysis of the characteristics of a fiduciary relationship, the court stated:

> A fiduciary relationship involves discretionary authority and dependency: One person depends on another – the fiduciary – to serve his interests.  In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another.  Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use.

*Id.* at 569.   "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance.  The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Id.* (internal quotations and citations omitted).  In *Chestman*, a wife told her husband about a pending tender offer for her family's company and also told him that the information was confidential.  Notwithstanding her admonition, the husband telephoned his broker and repeated the information, after which the broker, Chestman, purchased the company's stock for himself and clients, and was indicted for insider trading and convicted at trial. *Id.* at 554-57.  With regard to the § 10(b) conviction, the court held that a family relationship coupled with disclosure of business information alone was not sufficient to establish a "similar relationship." *Id.* at 570.  As between the husband and wife, the court found that there was simply no proof that the

husband had implicitly assented to a duty of trust with respect to business-related information.  No prior sharing had been shown, nor any other reason to justify a belief on the wife's part that the trust would be respected as to this sort of business communication.  The court found that the wife's disclosure to her husband of the confidential information "served no purpose, business or otherwise."  *Id.* at 571. In short, the communication from wife to husband was unprompted and gratuitous in nature.

In determining whether reliance, de facto control and dominance are present in any given relationship, one court relying on *Chestman* recently stated that: "In those cases upholding misappropriation liability, fiduciary-like dominance generally arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid."  *Kim*, 184 F.Supp.2d at 1011; *see also United States v. Cassese*, 273 F.Supp.2d 481, 486 (S.D.N.Y. 2003) (same).  In *Kim*, the court rejected the existence of a fiduciary relationship between two chief executive officers who shared confidences as members of the Young Presidents Organization, a social and professional networking group made up of young chief executives, including Kim.  In that case, a member of the organization sent word that he would not be attending a retreat because his company was involved in merger negotiations.  After learning of the pending merger, Kim traded in that company's stock for personal profit.  Notwithstanding the organization's emphasis on confidentiality of group discussion among its members, the court held that Kim could not be charged with violations of § 10(b) and Rule 10b-5 under the misappropriation theory, since "Chestman requires the influence of a superior or dominating nature – not the 'influence' one peer might exert against another" (184 F.Supp.2d at 1011), and characterized the relationship before it as between "peers who gather to socialize, exchange information, and seek

advice." *Id.* at 1013.  In rejecting the application of the misappropriation theory of liability to Kim, the court laid out the earmarks of a fiduciary-like relationship, lacking in the case before it:

> These are not relationships among equals.  As *Chestman* requires, they are characterized by superiority, dominance, or control. Attorneys and psychiatrists are possessed of superior knowledge and expertise.  Clients and patients must relay confidential information to receive the benefit of that superior knowledge (it comes in the form of legal advice and medical treatment) . . .  Where misappropriation theory is appropriately applied, the spread of the confidential information cannot be stanched at its source without unacceptable ramifications.  Clients need the advice of lawyers.  Patients need treatments.

*Id.* at 1011-1012.

Assuming the allegations in the complaint are true, as the court must for purposes of a motion to dismiss, the relationship alleged between Kornman and the two executives, respectively, is not akin to a relationship between peers with equal expertise and knowledge who gather to socialize and seek advice from one another, such as that in *Kim*, but more akin to a relationship characterized by "disparate knowledge and expertise" and "a persuasive need to share confidential information[.]" *See Kim*, 184 F.Supp.2d at 1011; *see also Cassese*, 273 F.Supp.2d at 486.  In this case, the SEC has more than adequately alleged disparate knowledge and expertise on the part of Kornman.  The complaint alleges that Kornman is a tax and estate-planner specializing in offering tax-shelter investments involving the use of partnerships to shelter capital-gains income (*see* Compl. at 5, ¶ 15), in addition to being a licensed attorney (*id.* at 4, ¶ 10), and that in telephone calls and in written correspondence with clients and prospective clients, Heritage touted its experienced lawyers and accountants.  *Id.* ¶ 16.  That Kornman possessed superior knowledge as to the subject matter of tax and estate-planning may serve as an indicator that a duty of trust and confidence had developed

between Kornman and the two executives.  *See Kim*, 184 F.Supp.2d at 1011-12; *see generally Chestman*, 947 F.2d at 569.

Moreover, unlike in *Chestman*, where the court determined that the wife's disclosure to her husband of the confidential information "served no purpose, business or otherwise[]" (*see* 947 F.2d at 571), the SEC has alleged sufficient facts from which a persuasive need on the part of the two executives, respectively, to share confidential information with Kornman and Heritage personnel can be inferred.  The complaint alleges that personal, confidential, and sensitive information needed to be shared in order to obtain the services offered by Heritage, namely, its tax and estate-planning services.  *See* Compl. at 6, ¶ 22 and at 9, ¶ 35.  Assuming the truth of these allegations, the relationship between Kornman and the two executives, respectively, could be characterized as one where "the spread of the confidential information cannot be stanched at its source without unacceptable ramifications." *Kim*, 184 F.Supp.2d at 1012.  Otherwise stated, the complaint adequately alleges that the disclosures by the two executives served a purpose, namely, disclosures regarding personal financial information were needed for Kornman to provide professional advice regarding tax and estate-planning to clients (and even to make a sales pitch to prospective clients).  Further, unlike in *Chestman*, where the court  found no express or implied acceptance of confidentiality by the husband (*see* 947 F.2d at 571), in this case, the complaint alleges that Heritage had in place numerous confidentiality safeguards, from which a reasonable inference can be drawn that Kornman, himself, recognized that Heritage's services necessarily entailed the sharing of confidential information and the consequent need to protect confidential information received from clients and prospective clients.  *See* Compl. at 5-6, ¶¶ 16-19.  The complaint alleges that at the conclusion of each meeting with clients and prospective clients, Heritage personnel were required

to prepare a memorandum summarizing the meeting which contained an explicit Confidentiality Provision. *See supra* at 3; Compl. at 5, ¶ 18. In addition, Heritage had a standard engagement agreement, which contained a confidentiality clause, requiring Heritage "to keep confidential . . . all documents received from the [client][.]" *See* Def. App. at 5. These allegations, if true, would demonstrate a persuasive need for executives seeking Heritage's expert estate and tax-planning services to share confidential information regarding, *inter alia*, their financial situation, and also adequately alleges that Kornman, by the very nature of the services he offered and by virtue of Heritage's internal safeguards relating to confidentiality, understood that such information gathered from clients and prospective clients would be confidential. In short, under *Chestman* and its progeny, the court finds that reliance, de facto control and dominance between Kornman and the MiniMed and Hollywood executives, respectively, are sufficiently alleged in the SEC's complaint.

The court's determination that the complaint has sufficiently alleged a fiduciary-like relationship to withstand Defendant's motion to dismiss is bolstered by the SEC's statements in adopting Rule 10b5-2, titled "Duties of Trust or Confidence in Misappropriation Insider Trading Cases," which became effective on August 24, 2000. 17 C.F.R. § 240.10b5-2 (2002) (prelim. note). Rule 10b5-2 defines three non-exclusive circumstances "in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading." *Id.* Rule 10b5-2(b)(1), one of the three circumstances set forth in the rule, provides, in relevant part: "For purposes of [10b5-2(b)], a 'duty of trust or confidence' exists in the following circumstances, among others: (1) Whenever a person agrees to maintain information in confidence. . . ." In this case, the complaint adequately alleges that Kornman agreed to safeguard the confidential information he obtained from the executives. The MiniMed executive was provided with a copy of the standard Heritage

agreement that contained a confidentiality provision.  Compl. at 6, ¶ 21.  The memorandum of the November 19, 2001 meeting between Kornman and the Hollywood executive pronounced its contents confidential.  *Id.* at 8, ¶ 34.  Similarly, the memorandum of the February 7, 2001 meeting between Kornman and the MiniMed executive pronounced its contents confidential.  *Id.* at 7, ¶ 24.  *See generally* Confidentiality Provision, *id.* at 5, ¶ 18 (declaring the information confidential and threating prosecution "to the limits of the law" for disclosure).  Heritage personnel also sent the Hollywood executive correspondence marked "PERSONAL & CONFIDENTIAL."  *Id.* at 2, ¶ 4.  These allegations, among others, bring this case within Rule 10b5-2(b)(1).  *See generally United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information, and . . . a fiduciary relationship, or its functional equivalent, exists only where there is an explicit acceptance of a duty of confidentiality or *where such acceptance may be implied* from a similar relationship of trust and confidence between the parties.") (emphasis added); *SEC v. Kirsch*, 263 F.Supp.2d 1144 (N.D. Ill. 2003) (fiduciary relationship found where one member of the "Software Executive Roundtable" specifically shared a business secret with other members, in light of explicit unwritten understanding among members for the need for confidentiality).

###### 2.    Prospective Business Relationships

The remainder of Defendant's argument in support of his motion hinges on the sweeping proposition that the Minimed executive's and Hollywood executive's ultimate decision not to retain Kornman and Heritage forecloses any application of § 10(b) of the Exchange Act and Rule 10b-5 to Kornman. *See* Def. Mot. at 2 ("no court has ever applied the misappropriation theory of insider trading to a prospective business relationship"); Def. Reply at 3 ("The core problem for the SEC in this case is that a salesman's unsuccessful effort to pitch services to business executives simply cannot be squared with the concept of fiduciary duty."). That Kornman was never ultimately retained by the MiniMed executive or the Hollywood executive is not dispositive, but is one of many factors the court must consider in determining whether the complaint adequately alleges a fiduciary-like duty between Kornman and the two executives, respectively. *Cf. General Acquisition, Inc. v. GenCorp Inc.*, 766 F.Supp.2d 1460, 1471 (S.D. Ohio 1990) (rejecting argument that agency relationship and resulting duty of confidentiality do not develop during period of solicitation as "ridiculous" "from a practical standpoint" since "[i]ndividuals such as real estate brokers and attorneys who often provide advice prior to the consummation of a transaction are still considered agents of the customer or client they serve.")

In support of its argument that the prospective nature of a business relationship somehow precludes application of the misappropriation theory, Defendant relies primarily on *United States v. Cassese*, *supra*, and *SEC v. Mayhew*, 916 F.Supp. 123 (D. Conn. 1995). *See* Def. Brief at 14; Def. Reply at 4.[5] Neither case stands for the sweeping proposition that the misappropriation theory can

---

[5]Defendant also criticizes the SEC for failing to address, let alone distinguish, the cases upon which Defendant relies, including *Cassese*. *See* Def. Reply at 3. The court agrees. The SEC failed to exert even a modicum of effort to address those cases, rendering the court's job much more difficult and extended.

never be applied in the context of a prospective business relationship.  In *Cassese*, the chairman and chief executive officer of Computer Horizons Corporation, Cassese,  met with a senior manager of a competitor company (Compuware Corporation) to discuss the potential acquisition of Computer Horizons by Compuware.  Both companies were in the business of providing temporary staffing of computer and information technology personnel.   *Cassesse*, 273 F.Supp.2d at 483.   While negotiations between the two companies were ongoing, Compuware representatives met with executives of a third-party corporation ("DPRC") to discuss a potential merger between Compuware and DPRC, and DPRC ultimately agreed to Compuware's offer to acquire all of DPRC's issued and outstanding stock through a tender offer at a price per share substantially above the then-prevailing market price. *Id.* at 483-84.  The chief executive officer of Compuware, Karmanos, then telephoned Cassese and told him that Compuware would not acquire Computer Horizons, but would acquire DPRC instead.   *Id.* at 484.   The next day, prior to any public announcement of the acquisition, Cassese acted on the nonpublic knowledge he had obtained from Karmanos and purchased DPRC shares at $13.25 per share.  After Compuware and DPRC announced the acquisition, DPRC's stock opened at $23.50 per share.  *Id.*  Cassese then instructed his securities brokers to sell his DPRC shares, yielding a profit of $150,937.50.  *Id.*  Cassese was subsequently charged with violating section 10(b) of the Exchange Act and Rule 10b-5 under the misappropriation theory.  Concluding that the relationship between Cassese and his competitor Karmanos was not one of superiority, dominance or control, the court granted Cassese's motion to dismiss the securities fraud count in the indictment.  *Id.* at 488.  Relying on *Chestman*, *supra*, and *Kim*, *supra*, the court determined that Cassese and Karmanos were not inherent fiduciaries at the time of disclosure, but rather potential arms-length business partners.  *Id.* at 485-88.  This decision did not turn on the prospective nature

of the business relationship between Cassese and Karmanos, but rather upon the case-specific analysis of their relationship under the factors set forth in *Chestman*, and later in *Kim*. Considering these factors, the court stated:

> [T]he key question is whether the relationship between Cassese and Karmanos is "best characterized as an equal relationship between peers or as a relationship involving a degree of dominance." *Kim*, 184 F.Supp.2d at 1011. Fiduciary-like dominance "arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid." *Id.* In the present case, none of these elements exist. Cassese was under no legal duty to aid Karmanos, Karmanos did not turn to Cassese for advice or for the use of his particular knowledge and skills, the two men shared "similar levels of achievement, experience and expertise," and there was "no persuasive need" for Karmanos to tell Cassese about Compuware's acquisition of DPRC. *Id.* at 1012.

*Cassese*, 273 F.Supp.2d at 486-87. Unlike the relationship between Cassese and Karmanos, as previously discussed, the relationship alleged in the complaint between Kornman and the MiniMed and Hollywood executives, respectively, is not one between peers with "similar levels of achievement, experience and expertise[.]" *See Cassese*, 273 F.Supp.2d at 487; *see* Compl. at 4, ¶ 10 and at 5, ¶¶ 15-16. Moreover, unlike Karmanos, who "did not turn to Cassese for advice or for the use of his particular knowledge and skills," (*see Cassese*, 273 F.Supp.2d at 487), given the allegations in the complaint, it can be reasonably inferred that the MiniMed and Hollywood executives were meeting with Kornman regarding possibly retaining him, specifically because of his expertise and superior knowledge in the area of tax-shelter investments involving the use of partnerships to shelter capital-gains income. *See* Compl. at 5, ¶ 15.[6]

---

[6]Similarly, in *SEC v. Mayhew*, 916 F.Supp. 123 (D. Conn. 1995), the prospective nature of the parties' relationship was one of many factors the court considered in concluding, following a bench trial, that the SEC had failed to submit enough proof of a fiduciary-like relationship to allow for liability under the misappropriation theory.

At the motion to dismiss stage, the question before the court is whether the allegations in the complaint, assuming they are true, would support a jury finding that a "similar relationship of trust and confidence" existed between Kornman and the two executives.  While the court does not herein make any determination that Kornman, in fact, had a "similar relationship of trust and confidence" with the two executives, the court is satisfied that the complaint sufficiently alleges that Kornman, an attorney and an experienced tax and estate-planning adviser and securities trader, solicited the opportunity to advise the MiniMed and Hollywood executives in connection with their personal wealth management, and that during the process of that solicitation, the two executives made Kornman privy to confidential information not only about themselves, but also about their respective corporation's plans to be acquired in the near future.  This sharing of confidential information was not gratuitous, but necessary so that Kornman could advise them regarding possible tax and estate-planning strategies available to them.  Based on the allegations in the complaint, a reasonable inference can be drawn that the parties understood that a trust or confidence had been reposed in Kornman not to use this confidential information for personal gain.  Kornman's understanding of the confidentiality can be readily inferred from the confidentiality safeguards employed by Kornman and Heritage.  *See* Comp. at 5-6, ¶¶ 16-19; Def. App. at 5.  Drawing all inferences and resolving all doubts in favor of the SEC, the court determines that under these allegations, the law imposed a duty on the part of Kornman to abstain from trading in securities based on this allegedly material, nonpublic information.  Moreover, in close cases, the better practice is to let the complaint stand and consider the adequacy of proof at the summary judgment stage.

### III.    Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 9(b) and for Lack of Scienter

Alternatively, Defendant moves to dismiss on the grounds that the "complaint fails to allege the requisite scienter" and fails to plead with particularity the circumstances constituting the alleged fraud, as required under Fed. R. Civ. P. 9(b).  *See* Def Mot. at 2-3; Def. Reply at 9.  According to Defendant, "[e]ven if Kornman owed a duty to the executives, the Complaint should be dismissed because it fails to allege facts showing that Kornman knew or believed (or was severely reckless in not knowing or believing) that he had a fiduciary-like duty to the two executives that he breached by trading."  *See* Def. Reply at 9.  In response, the SEC contends that it has abundantly pleaded the requisite scienter and satisfied the pleading requirements of Rule 9(b).  The court agrees with the SEC.

Fed. R. Civ. P. 9(b) provides that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Scienter, in relation to securities fraud, is "the intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976); *Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 1997); *Mercury Air Group, Inc. v. Hogan*, 237 F.3d 542, 546 (5th Cir. 2001).  Scienter may be satisfied by proof that the defendant acted with severe recklessness.  *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).  Strict intentional misconduct is not necessary; it is sufficient to prove that the conduct in question is an "extreme departure from the ordinary standards of care." *Trust Co. of La.*, 104 F.3d at 1490.  "To plead scienter adequately, a plaintiff

must set forth specific facts that support an inference of fraud." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). Under *Tuchman*:

> The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show a defendant's motive to commit securities fraud.  Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.

*Id.*  In this case, the SEC has alleged more than enough specific facts to support an inference of scienter under *Tuchman* and has satisfied Rule 9(b).  The SEC's allegations regarding the extremely opportunistic timing of Kornman's purchases immediately after learning the confidential information, including his Hollywood purchases at below the suggested acquisition price, support an inference that he had adequate scienter and  provide strong circumstantial evidence of conscious behavior.  Specifically, with regard to Hollywood, the complaint alleges that within a week of the November 19, 2001 meeting, Kornman directed his trading assistant to begin acquiring Hollywood shares in the account of Heritage Capital Opportunities Fund I LP, one of  Kornman's hedge funds, and instructed the assistant to purchase the shares at a price below $11 per share, which was the highest acquisition price mentioned by the Hollywood executive at the November 19 meeting.  *See* Compl. at 10, ¶ 40.  With regard to MiniMed, on February 9, 2001, two days after the meeting, Kornman orally directed his trading assistant to purchase 6600 shares of MiniMed for the account of Heritage Capital Partners I LP, one of Kornman's hedge funds, at the market price of $38.76 per share.  *Id.*  ¶ 25.

In further satisfying the standard for adequately pleading scienter, the complaint sufficiently alleges that Kornman subjectively believed that the information received was obtained in breach of

a fiduciary duty. *See Chestman*, 947 F.2d at 570; *United States v. Mylett*, 97 F.3d 663, 668 (1996), *cert. denied sub nom. Cusimano v. United States*, 521 U.S. 1119 (1997). Such a belief may be shown by circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n.30 (1983)). Kornman knew that the MiniMed executive was the founder and then-chief executive officer of MiniMed, a classic insider. *See* Compl. at 1-2, ¶ 2 and at 6, ¶ 20. Kornman knew that the Hollywood executive was a former-chief executive officer, founder, board member and major shareholder of Hollywood, also an insider. *Id.* at 2, ¶ 3 and at 8 ¶¶ 30, 32. The complaint also alleges that Kornman was a sophisticated investor and owned Heritage Securities Corporation, a securities broker-dealer registered with the Securities and Exchange Commission, and individually held various securities licenses. *Id.* at 4, ¶ 11. The complaint further alleges that Kornman also personally directed the investments of two hedge funds, Heritage Capital Partners I LP and Heritage Capital Opportunities Fund I LP, which were managed by a Kornman-controlled management company, and operated for the benefit of Kornman, several entities he controlled and a few third-party investors. *Id.* ¶ 14. In light the allegations that Kornman was a sophisticated investor, and that he knew that both the MiniMed executive and the Hollywood executive were classic insiders, and that they provided him information regarding potential acquisitions, the court determines that the SEC has adequately alleged scienter. *See Mylett*, 97 F.3d at 668 (in misappropriation case under § 10(b) and Rule 10b-5, rejecting as "meritless" defendants argument that government had not shown scienter, that is, that he subjectively believed that the information he obtained was in breach of a fiduciary duty, since defendant "knew that [the person who gave him information] was a Vice President of AT&T").

As the SEC correctly asserts, the complaint contains the "who, what, where, when and how" allegations generally required in securities fraud cases. *See* Plf. Resp. at 23. The complaint identifies (i) the executives from whom Kornman allegedly misappropriated inside information; (ii) the dates on which the meetings with the executives allegedly occurred; (iii) the specific inside information on which Kornman allegedly traded; (iv) the dates and prices of the stock acquisitions; (v) the hedge funds through which Kornman conducted the alleged insider trading; and (vi) the profits Kornman realized through his allegedly illicit trading." *See id.* Moreover, as properly pointed out by the SEC (*see id.* at 24), Defendant is erroneously relying on the heightened pleading standards from private securities litigation under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(1). These standards only apply in private actions, and not SEC enforcement actions. *See, e.g., SEC v. Lucent Technologies*, 363 F.Supp.2d 708, 717 (D.N.J. 2005) ("The parties appear to agree, however, and the case law supports the conclusion, that the heightened pleading requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC"); *SEC v. Prater*, 296 F.Supp.2d 210, 215-16 (D. Conn. 2003) ("Curiously, Defendants include in their brief a fourteen-page exegesis on the [PSLRA]. Since actions brought by the SEC are not considered 'private litigation,' the standard imposed in the PSLRA for pleading scienter does not apply to the SEC").

Finally, when questioned about his alleged trading scheme during the Commission's investigation, Kornman invoked his Fifth Amendment rights against self-incrimination" and refused to testify. *See* Pl. Resp. at 23. The court is entitled to draw an adverse inference from Kornman's assertion of his Fifth Amendment rights against self-incrimination and refusal to testify in the Commission's investigation. *See Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983)

(citing the prevailing rule that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them") (citations omitted).

Having reviewed the allegations in the complaint, the court rejects Defendant's argument that the SEC's complaint should be dismissed for failure to plead with particularity the circumstances constituting the alleged fraud, as required under Fed. R. Civ. P. 9(b), and for failure to allege the requisite scienter. Accordingly, Defendant's motion to dismiss on these grounds should be **denied**.

## IV.     SEC's Motion to Strike

The SEC has filed a motion to strike newspaper articles and similar material that Kornman has attached to his motion to dismiss. Defendant cites to these articles as factual evidence that the information allegedly obtained by Kornman in violation of § 10(b) of the Exchange Act and Rule 10b-5 was already public. As already set forth above, Defendant's motion to dismiss is not premised on its fact-based argument that the information was already public. *See supra* at 11-12 n.2. As Defendant has not moved to dismiss based on these articles, the court has had no need to consider them. Accordingly, the SEC's Motion to Strike is **denied as moot**.

## V.     Conclusion

In short, assuming all facts alleged in the SEC's complaint to be true and resolving every doubt in favor of the SEC (*see Lowrey*, 117 F.3d at 247), the court determines that the complaint sufficiently alleges a claim for insider trading under the misappropriation theory. Otherwise stated, it cannot be said "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45-46. For the reasons stated herein, the court

**denies** Defendant Gary M. Kornman's Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P.

12(b)(6) and 9(b) and **denies as moot** the SEC's Motion to Strike.

      **It is so ordered** this 29th day of September, 2005.

                                    Sam A. Lindsay
                                    United States District Judge

**Memorandum Opinion and Order – Page 30**